J-S26001-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.K.C.-C., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.J.C., IV, FATHER | : : : : : : : | |
| | : | No. 3594 EDA 2018 |

Appeal from the Order Entered November 19, 2018
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-AP-0000624-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: A.C., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.J.C., IV, FATHER | : : : : : : : | |
| | : | No. 3595 EDA 2018 |

Appeal from the Order Entered November 19, 2018
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-DP-0002599-2016

BEFORE:   PANELLA, P.J., GANTMAN, P.J.E., and PELLEGRINI*, J.

MEMORANDUM BY PANELLA, P.J.:                **FILED JUNE 25, 2019**

In these consolidated appeals, J.J.C., IV ("Father") appeals from the

decree involuntarily terminating his parental rights and the order changing the

_____

* Retired Senior Judge assigned to the Superior Court.

placement goal from reunification to adoption with respect to his daughter,

A.K.C.-C., born in November of 2016 ("Child").[1]  We affirm.

The trial court set forth the following factual and procedural history of

this case:

> [The Philadelphia Department of Human Services ("DHS")] originally became involved with this family in July 2016 for matters regarding Child's siblings.  On [], DHS received a General Protective Services ("GPS") report alleging that Child tested positive for marijuana after Mother gave birth on that same day. On November 18, 2016, DHS met with Father at the hospital. Father requested a paternity test from DHS.  Father informed DHS that he was employed, but he was unable to care for Child because he resided in a homeless shelter.  When Child was ready for discharge on November 21, 2016, DHS obtained an Order of Protective Custody ("OPC") and placed her with Paternal Grandmother.
>
> A shelter care hearing was held for Child on November 23, 2016. Father did not attend this hearing.  The trial court lifted the OPC and ordered the temporary commitment to DHS to stand.  On December 1, 2016, the trial court adjudicated Child dependent, discharged the temporary commitment, and committed Child to DHS based on present inability to provide proper parental care and control.  Father was referred to the Clinical Evaluation Unit ("CEU") for a drug and alcohol screen, assessment, monitoring, and three random drug and alcohol screens.  Father was referred to the Achieving Reunification Center ("ARC") for appropriate services.  Father was also ordered to comply with the DHS investigation and to comply with all services and recommendations.  On December 2, 2016, Child was placed with a family friend ("Foster Parent"), which is where Child currently resides.
>
> On February 27, 2017, a permanency review hearing was held for Child.  Father was not present for this hearing.  The trial court

_____

[1] The trial court entered a decree voluntarily terminating the parental rights of Child's mother, S.S.C. ("Mother").  Mother did not file a notice of appeal, nor has she participated in this appeal.

learned that Father was incarcerated. The trial court found that Child's placement continued to be necessary and appropriate.

On May 2, 2017, a permanency review hearing was held for Child. Father was present for this hearing. The trial court learned that Father was released from prison. Father was referred to the ARC for services and CUA was ordered to conduct a home assessment at Father's home.

On June 22, 2017, Community Umbrella Agency ("CUA") revised the [Single Case Plan ("SCP")]. Father did not participate in this meeting. Child's goal was identified as "return to parent." Father's parental objectives were to sign medical consents and releases for Child; engage in parenting education classes through ARC services; establish a relationship with Child; and attend weekly supervised visits at the agency.

On September 12, 2017, a permanency review hearing was held for Child. Father was present for this hearing. It was determined that Father had been moderately compliant with the permanency plan. Father was ordered to continue attending visits with Child at the agency and the visits could be modified by agreement of the parties.

On December 11, 2017, a permanency review hearing was held for Child. Father was present for this hearing. It was determined that Father had been moderately compliant with the permanency plan. Father was ordered to provide documentation of his employment to CUA. Additionally, Father's visitation was modified to bi-weekly, supervised visitation at the agency, due to lack of participation. The trial court ordered that if Father attended three scheduled visits with Child, Father's visits may return to weekly supervised at the agency.

On March 9, 2018, a permanency review hearing was held for Child. Father was present for this hearing. It was determined that Father was not compliant with the permanency plan. Father was referred to the CEU for a forthwith drug screen, dual diagnosis assessment, and three random drug screens. The trial court suspended Father's visits until further notice and issued a stay-away order against Father. On March 9, 2018, the trial court ordered that a protective order be entered on behalf of all caregivers and social workers involved in the case to ensure the safety and promote the best interests of Child. Father was ordered to refrain from any contact, directly or indirectly, and to

refrain from any and all intimidation personally or by family and/or friends.

On March 16, 2018, the SCP was revised. Child's alternate/concurrent goal was identified as adoption. Father's parental objectives were to sign medical consents and releases for Child; obtain stable employment and provide CUA with documentation; obey the court order regarding cancelled visitation with Child until the stay-away order was lifted; and attend anger management classes.

On June 1, 2018, a permanency review hearing was held for Child. Father was not present for this hearing. It was determined that Father was not compliant with the permanency plan. Father was referred to the CEU for a forthwith drug screen, assessment, and three random drug screens, once he availed himself.

Child has been in DHS care since November 21, 2016, her entire life. Father has failed to consistently comply with his objectives and comply with court orders throughout the life of the case. DHS filed petitions to involuntarily terminate Father's parental rights and change Child's permanency goal to adoption on August 10, 2018.

Trial Court Opinion, 2/19/19, at 1-3.

The trial court conducted a hearing on DHS's petitions on November 19, 2018.[2] DHS presented the testimony of Faith-Joy Toe, the CUA case manager.

_____

[2] At the hearing, Child had the benefit of both a guardian *ad litem* ("GAL"), Attorney Carla Beggin, as well as separate legal counsel, Attorney Daniel Kurland. Attorney Kurland indicated that he met with Child, who was two years old, and noted that Child was not able to vocalize her wishes, but appeared to be very well taken care of in the foster home. N.T., 11/19/18, at 41. Attorney Kurland advocated for the termination of Father's parental rights. *Id.* at 59. As such, we find the requirements of 23 Pa.C.S.A. § 2313(a) were satisfied. *See In re Adoption of L.B.M.*, 161 A.3d 172, 174-75, 180 (Pa. 2017) (plurality) (stating that, pursuant to 23 Pa.C.S.A. § 2313(a), a child who is the subject of a contested involuntary termination proceeding has a statutory right to counsel who discerns and advocates for the child's legal interests, defined as a child's preferred outcome); *see also In re T.S.*, 192 A.3d 1080, 1089-1090, 1092-93 (Pa. 2018) (finding the preferred outcome of

Father testified on his own behalf. On November 19, 2018, the trial court entered the decree involuntarily terminating Father's parental rights to Child, and the order changing Child's permanent placement goal to adoption. Father filed timely notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). This Court consolidated the appeals *sua sponte*.

On appeal, Father raises the following issues for our review:

1. Did the [t]rial judge rule in error that [DHS] me[]t its burden of proof that Father's parental rights to his child be terminated.

2. Did the trial judge rule in error that the termination of Father's parental rights would best serve the needs and welfare of the child[].

3. Did the [t]rial judge rule in error that [DHS] me[]t its burden of proof that the goal be changed to adoption.

Father's Brief at 3.

We review these claims mindful of our well-settled standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously

_____

a child who is too young or non-communicative to be unascertainable and reaffirming the ability of an attorney-GAL to serve a dual role and represent a child's non-conflicting best interests and legal interests).

emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. § 2101-2938, which requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (2), as well as (b). This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of Section 2511(a), as well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We will focus our analysis on Section 2511(a)(2) and (b), which provides as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2) and (b).

We first consider whether the trial court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those

- 7 -

grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

In his first issue, Father argues that the trial court erred in determining grounds for termination existed pursuant to Section 2511(a)(2). *See* Father's Brief at 5-7. Father claims that he met nearly all of his SCP goals, and that the only goal he did not address involved housing. *See id.* at 5-6. Father asserts that his visits were suspended by the court, and this resulted in a "form of judicial alienation." *See id.* at 6. Father contends that he never "threatened the child or harmed the child" and that his "only disagreements and arguments were with some of the adults on the case." *See id.* With respect to housing, Father contends that the evidence does not support termination of his parental rights, observing that parental rights cannot be terminated solely on the basis of environmental factors such as inadequate housing if found to be beyond the control of the parent. *See id.* at 7.

The trial court concluded that termination pursuant to Section 2511(a)(2) was appropriate, explaining:

> Throughout the time that Child has been in the custody of DHS, Father's SCP objectives were dual diagnosis, random drug screens, parenting, housing, employment, supervised visitation with Child, and anger management. Father was aware of his objectives. Although Father did engage in a mental health program at some point during the life of the case, Father never complied with the drug and alcohol portion of the dual diagnosis objective. Father did not avail himself to the CEU for an assessment or for random drug screens until September 28,

2017,[3] after the petitions were filed. Father was aware that he was ordered to visit the CEU for a dual diagnosis assessment and random drug screens. Father claimed that CUA never called him for a random drug screen, but CUA indicated that the CUA case manager's supervisor reached out to Father regarding the random drug screens. CUA has no information that he has attended a mental health assessment. CUA still has concerns regarding Father's mental health status. Father confirmed that he is not participating in any type of mental health treatment. Father completed parenting, housing, and employment workshops at the ARC in 2017. Although Father completed employment and claims that he works under the table, Father has never given CUA any verification of employment or income. Father did complete housing at the ARC, but Father presented a new address at the termination and goal change hearing. Father never provided his new address to the CUA case manager, never requested a home assessment at the new residence, and never provided information about the occupants of the home for clearances. Father is always transient and fails to avail himself to CUA for home assessments by maintaining his current address with CUA. Father's visits have been suspended since March 9, 2018. Father's visits were to remain suspended until Father completed the dual diagnosis assessment and any recommended services, including anger management. Father's visits were suspended due to Father's angry and aggressive demeanor while at the courthouse for the permanency review hearing on March 9, 2018, and a prior incident at visitation towards CUA. While Father was at the courthouse for the March 9, 2018, permanency review hearing, Father threatened Mother, a sibling of Child, the previous foster parent, the resource parent, the CUA case manager, and the visitation staff by stating, "Anybody that try to take my child from me will get it. They can get it." When Father made these statements, Father was angry, aggressive, and pacing back and forth. Father denies being threatening, but Father has had a prior incident of

---

[3] The reference to the CEU involvement beginning on September 28, 2017 appears to be a typographical error, as the record from Child's dependency docket contains a CEU Progress Report indicating that the drug screens and assessment occurred between September of 2018 and November of 2018. CEU Progress Report. This is consistent with the testimony at the hearing. *See* N.T., 11/19/18, at 21. Further, it appears that Father provided a negative drug screen in December of 2016, and a drug screen in January of 2017 that was positive for marijuana.

being angry and not taking re-direction from CUA. Prior to the suspension of Father's visits, Father missed a substantial amount of supervised visits with Child between 2017 and early 2018. In 2017, Father attended nine visits, but missed eleven scheduled visits. For the life of the case, Father has only visited Child for a total of eighteen hours. When the CUA case manager attempted to speak to Father about the missed visits at a meeting, Father became so angry and aggressive that CUA had to abruptly end the meeting due to safety concerns. Father's SCP objectives were modified to include anger management due to Father's behavior on March 9, 2018. Father stated that he never completed an anger management class. Father's visits were not reinstated because he did not comply with anger management and drug and alcohol programs. At the time that the petitions were filed, Father had been minimally compliant with his goals. Child needs permanency, which Father cannot provide. Father has demonstrated that he is unwilling to provide Child with essential parental care, control, or subsistence necessary for her physical and mental well-being. Father has not inquired about Child's physical well-being or medical status. The conditions and causes of Father's incapacity cannot or will not be remedied by Father. Child has been in foster care for most of her life. Father has attended almost all of the court hearings in this matter and is aware of his SCP objectives. Father had ample opportunity to put himself in a position to parent. Child cannot be safely returned to Father's care. Father's repeated and continued incapacity has not been mitigated. The DHS witness was credible. Termination under 23 Pa.C.S.A. § 2511(a)(2) was [] proper.

Trial Court Opinion, 2/19/19, at 7-9 (citations to the record omitted).

The record supports the trial court's decision to terminate Father's parental rights pursuant to Section 2511(a)(2). Toe, the CUA case manager, testified Father first made contact in July of 2017 after Father was released from incarceration. *See* N.T., 11/19/18, at 17. At that time, she informed Father that the SCP required him to attend dual diagnosis treatment; submit negative drug screens; attend ARC for parenting, housing, and employment programs; obtain appropriate housing; and attend visitation at the agency.

*See id.* at 18. Although Father completed his ARC programs, Father did not participate in a dual diagnosis program until just before the termination hearing. *See id.* at 19-20. Father attended some mental health treatment, but, at the time of the termination hearing, he was not actively treating. *See id.* at 20, 54. Further, Father did not regularly submit to drug testing or schedule his drug and alcohol assessment until September of 2018. *See id.* at 21-23, 36. DHS did not receive Father's drug and alcohol assessment until the day of the termination hearing. *See id.* at 31.

Further, Father's visitation was sporadic. Father missed 11 out of 20 visits. *See id.* at 24, 36. Prior to a permanency review hearing in March of 2018, Father made the threat, "Anybody that try to take my child from me will get it," towards Mother, CUA staff, and the resource parents. *See id.* at 27-29. As a result, the juvenile court issued a stay-away order, suspending Father's visitation. *See id.* at 30-31. Further, the SCP was revised to include anger management classes, which Father acknowledged he did not attend. *See id.* at 42, 60. Father did not visit with Child following the order suspending visitation and, during the time Child was in care, Father saw her for only 18 hours over nine visits. *See id.* at 36-37.

Moreover, Father did not avail himself of the opportunity to have DHS perform a home assessment[4] and DHS could not verify employment or

---

[4] Father testified he previously resided in at least two different homes during the time Child was in care. *See* N.T., 11/19/18, at 54-55. At the termination hearing, Father reported a new address. *See id.* at 5-6, 32.

income, as Father claimed he was working as a barber and in construction, but did not provide proof of income. *See id.* at 33-35, 46-47. Toe characterized Father's compliance as minimal. *See id.* at 38-39. She did not believe that Child could safely be returned to Father's care. *See id.*

Although Father argues he was prevented from visiting Child due to "judicial alienation," Father did not appeal the order suspending his visitation, missed more than half of the visits he was permitted, and made limited progress towards meeting the other requirements of the SCP.

Further, contrary to Father's argument, the trial court did not terminate Father's parental rights "solely on the basis of environmental factors such as inadequate housing. . . if found to be beyond the control of the parent." *See* 23 Pa.C.S.A. § 2511(b). Instead, Father did not avail himself of the opportunity to allow DHS to investigate his housing, and presented no evidence that his housing issues were beyond his control.

Moreover, the trial court did not base its termination decision solely on Father's housing. Rather, the trial court based its decision on numerous failures on the part of Father to comply with the SCP.

As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006). The record substantiates the conclusion that Father's repeated and

continued incapacity, abuse, neglect, or refusal has caused Child to be without essential parental control or subsistence necessary for her physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272. What is more, the record supports the court's determination that Father cannot or will not remedy this situation. *See id.* As noted above, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a) before assessing the determination under Section 2511(b), and we, therefore, need not address any further subsections of Section 2511(a). *In re B.L.W.*, 843 A.2d at 384.

> As to Section 2511(b), our Supreme Court has stated as follows:
>
> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted).

- 13 -

With respect to Section 2511(b), Father argues that the trial court did not consider the impact of severing Child's bond with Father, claiming that DHS did not present any evidence of the interactions between Father and Child. **See** Father's Brief at 7. Father asserts that the evidence presented at the hearing only related to the bond between Child and her foster parents. **See id.** at 8. Accordingly, Father concludes that the trial court erred in its determination pursuant to Section 2511(b) because it lacked evidence about the impact that severing the bond between Father and Child would have on Child. **See id.** at 8.

The trial court determined that DHS established that termination of Father's parental rights best met Child's needs and welfare pursuant to Section 2511(b), explaining:

> For the life of the case, Father has only visited Child for a total of eighteen hours. Father has never provided any gifts or cards to Child. Father has never inquired about Child's physical well-being or her medical status. In the early stages of the case, Father would ask for pictures, but he has not inquired since. Child does not know Father. Child is currently placed with resource parents and two of her siblings. Child depends on her resource parents for her day-to-day needs. Child is developmentally on track and thriving in the care of the resource parents. When Child is separated from the resource parents, she will follow them and cries. Child is very attached to her resource parents. It would be detrimental to Child and her siblings if Child was removed from the resource parents' home. Child is bonded with the resource parents. Child does not depend on Father for any of her daily needs. Child cannot be safely returned to Father's care. Child was appointed legal counsel ("Legal Counsel") and Legal Counsel met with Child and had the chance to observe Child. Since Child is only two-years-old, Child was unable to verbalize her wishes regarding adoption or reunification. Legal Counsel did observe that Child is well cared-for in the resource parents' home. The

> record establishes by clear and convincing evidence that termination would not sever an existing and beneficial relationship with Father. It is in the best interest of Child to be freed for adoption and it would not be harmful to Child if Father's parental rights were terminated. The DHS witness was credible. The trial court's termination of Father's parental rights to Child under 23 Pa.C.S.A. § 2511(b) was proper and there was no error of law or an abuse of discretion.

Trial Court Opinion, 2/19/19, at 10-11 (citations to record omitted).

The record supports the trial court's conclusion that termination of Father's parental rights best meets Child's needs and welfare pursuant to Section 2511(b). Toe testified that Father's relationship with Child consisted of nine visits for 18 hours, with no contact after March of 2018. *See* N.T., 11/19/18, at 36-37. Although Father initially asked for pictures of Child, Father did not provide gifts or cards for Child, and did not otherwise inquire about her well-being. *See id.* at 37. Toe testified that Child does not know Father. *See id*.

Child has been in the same foster home for essentially her entire life, and she lives with her siblings. *See id*. at 4, 7-8, 14. In Father's absence, Child is thriving in foster care. *See id.* at 38. Child is attached to her foster parents and refers to them as "mom" and "dad." *See id.* Toe believed that it would be harmful to Child to separate her from her foster parents. *See id.* In contrast, Toe opined that terminating Father's parental rights would not be harmful to her, and that it would be in Child's best interest to be freed for adoption. *See id.* at 39.

Contrary to Father's argument, the credited testimony established the lack of a bond as Child does not know Father. Further, Child is thriving with her resource parents. Preserving Father's parental rights would serve only to deny Child the permanence and stability to which she is entitled. ***See In re Adoption of C.D.R.***, 111 A.3d 1212, 1220 (Pa. Super. 2015) ("Clearly, it would not be in Child's best interest for his life to remain on hold indefinitely in hopes that Mother will one day be able to act as his parent"). Accordingly, the trial court did not err in terminating Father's parental rights to Child pursuant to Section 2511(b).

In his final issue, Father argues the trial court erred in changing Child's permanent placement goal to adoption. The Juvenile Act governs proceedings to change a child's permanent placement goal. ***See*** 42 Pa.C.S.A. §§ 6301- 6375. Trial courts must apply the following analysis:

> Pursuant to [42 Pa.C.S.A.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa. Super. 2011) (citations and quotation marks omitted).

Father asserts that the trial court erred by failing to consider the emotional bond between Father and Child and "the effect of its permanent severance on the child." *See* Father's Brief at 8. Father contends that there was no evidence about the impact that severing the parental bond would have on Child. *See id.* at 9. Accordingly, Father asserts that the trial court erred in concluding that it was in Child's best interest to change Child's permanency goal to adoption. *See id.*

Addressing its decision to change the permanent placement goal to adoption, the trial court wrote:

> Child is currently placed with resource parents and two of her siblings. Child depends on her resource parents for her day-to-day needs. Child is developmentally on track and thriving in the care of the resource parents. Child has been with [the resource parents] almost since the day of her birth. When Child is separated from the resource parents, she will follow them and cries. Child is very attached to [the resource parents]. Child cannot be safely returned to Father's care. It is in the best interest of Child to be freed for adoption. The DHS witness was credible. The record established by clear and convincing evidence that the court's change of Child's permanency goal from reunification to adoption was proper. Child needs permanency.

Trial Court Opinion, 2/19/19, at 13 (citations to record omitted).

Our review of the record supports the trial court's finding that a goal change to adoption was in Child's best interest. At the time of the proceedings, in November of 2018, Child had been in foster care for over two years. Father saw Child for 18 hours over her time in care, and Child does

not know Father. Additionally, Father failed to make any material progress towards reunification during Child's time in care. Accordingly, it is clear that Father will not be in a position to provide Child with a safe and permanent home at any point in the foreseeable future. In addition, the record reveals that Child does not share a bond with Father and instead shares a parental bond with her resource parents. Therefore, we discern no abuse of discretion by the court in changing Child's permanent placement goal from reunification to adoption.

For the foregoing reasons, we affirm the decree terminating Father's parental rights to Child, and the order changing Child's permanent placement goal to adoption.

Decree and order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/25/19